## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No. 06-294 (JDB)** |
| | : | |
| **v.** | : | |
| | : | |
| **JOAQUIM DESOUSA,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its counsel, the United States Attorney for

the District of Columbia, hereby submits this memorandum in aid of sentencing of defendant

Joaquim DeSousa.  Pursuant to a plea agreement, the defendant pleaded guilty to two counts of

mail fraud (18 U.S.C. § 1343), nine counts of wire fraud (18 U.S.C. § 1343), and seven counts of

credit card fraud (18 U.S.C. § 1029(a)(5)).  The government requests that the Court (1) impose a

sentence within the United States Sentencing Guidelines range of 37-46 months, and

recommends a sentence of 41 months of incarceration, (2) impose a three year term of supervised

release, (3) require the defendant to pay restitution, and (4) impose special conditions that the

defendant (a) obtain and maintain full employment following his release, with the circumstances

of the defendant's employment at the discretion of the Probation Office, but subject to review by

the Court, (b) not obtain any employment positions in which he will be responsible for or have

access to another person's or business's or organization's financial assets or personal identifying

information (specifically Social Security numbers), (c) neither directly nor indirectly incur credit

card charges, open additional lines of credit, obtain access devices, or negotiate or consummate

any financial contracts without the approval of the Probation Office, and (d) neither directly nor

indirectly control, operate or own any websites without the approval of the Probation Office.

**FACTUAL BACKGROUND**

A.    **The Indictment, Plea Agreement and Special Condition of Release**

A federal grand jury indicted DeSousa on October 3, 2006, charging him with two counts of mail fraud, ten counts of wire fraud, seven counts of credit card fraud, and one count of first degree theft.  On April 25, 2007, DeSousa pleaded guilty to counts one and two and four through nineteen of the indictment charging mail fraud, wire fraud and credit card fraud.  DeSousa admitted that, beginning in August 2002, he defrauded more than 400 people by placing advertisements in local newspapers and over the internet offering employment, financial information and at-home massages.  He admitted that instead of providing the promised information or service, he misappropriated the individuals' personal information to open credit accounts or make unauthorized charges.  He also admitted that he used a number of aliases (Joaquin Desouza, Jack Sousa, and Jack Ford), created a number of business names (HCI, HCL, HCC, and New Jack Escort), operated from a number of DC addresses, and used at least two DC phone numbers.  *See* PSR ¶¶ 8-16.

At the plea hearing, this Court allowed DeSousa to remain on personal recognizance, but ordered him as a condition of release to close out all websites related to automated teller machines (ATMs).  The special condition requiring DeSousa to close out all ATM-related websites arose from the government's discovery after the indictment, but prior to the plea hearing, that DeSousa had conducted fraudulent transactions through an ATM-related website named www.hcinc.biz.  More specifically, the government learned that DeSousa had operated the website to defraud several people by passing off used ATMs as new ATMs.

**B.**    **DeSousa's failure to close ATM-related websites**

Since his plea hearing on April 25, 2007, DeSousa has ignored this Court's directive that he close out all ATM-related websites.  Instead, through July 2007, DeSousa operated an ATM-related website at www.hcinc.biz.  Even worse, he operated that website in a fraudulent manner. After he shut down that website following the government's demand that he do so, he began a second ATM-related website (www.acapitolatm.com).  And he has continued to operate a third ATM-related website (www.hcinc.biz/home.nxg).

In early July 2007, Special Agent Mathew Lucjak of the United States Secret Service, the lead case agent, received information from a complainant that DeSousa continued to operate his website at www.hcinc.biz.  *See* Declaration of Mathew Lucjak in Support of the Government's *Ex Parte* Emergency Motion to Revoke Defendant's Release Pending Sentencing ("First Lucjak Dec.") at ¶ 11 (attached hereto as Exhibit 1 and as Exhibit 1 to the Government's *Ex Parte* Emergency Motion to Revoke Defendant's Release Pending Sentencing) (filed Aug. 27, 2007). Special Agent Lucjak learned from the complainant that another individual, Ms. Julett Cox, had allegedly been defrauded by DeSousa as a result of the website.  *Id.*  Following receipt of this information from the complainant, Special Agent Lucjak began monitoring DeSousa's website at www.hcinc.biz.  The website remained active until July 9, 2007, when it was taken down upon the government's demand.  As a result, DeSousa continued to operate the ATM-related website at www.hcinc.biz from April 25, 2007 through on or about July 9, 2007.

Special Agent Lucjak subsequently interviewed by telephone Ms. Julett Cox of St. Petersburg, Florida.  *See* Lucjak Dec. at ¶ 12.  Ms. Cox stated that following her original contact with DeSousa was in March 2007, when she came across his website, www.hcinc.biz, on the

3

internet advertising ATMs for sale, she ultimately wired DeSousa/HCI Communication $9400 on

May 1, 2007 for the purchase of two new ATMs.  *Id.* ¶ 13.  According to Ms. Cox, the ATMs

that arrived from HCI 3-4 weeks later were old, used and beaten up.  *Id.* According to Ms. Cox,

the machines were so outdated that she was told they were inoperable.  *Id.* ¶ 14.

    It appears that two weeks after DeSousa closed out his ATM-related website at

www.hcinc.biz, he opened a new website at www.acapitolatm.com.  *See* Declaration of Special

Agent Mathew Lucjak in Support of the Government's Sentencing Memorandum ("Second

Lucjak Dec.") at ¶ 4 (attached hereto at Exhibit 2).  This second website, like the first, advertised

the sale of ATMs, except with the banner "under new management."  *Id.*  This purportedly "new

management," like the old management, used DeSousa's phone number of 410-900-7912 and is

otherwise virtually identical in appearance and content to his original website at www.hcinc.biz.

*Id.*  In calling one of the phone numbers listed at www.acapitolatm.com, Special Agent Lucjak

determined that DeSousa operated the website in partnership with another individual.  *Id.* ¶ 5.

Despite this Court's Order that DeSousa shut down all ATM-related websites, his website at

www.acapitolatm.com is currently operational.  *Id.* ¶ 4.

    But www.acapitolatm.com is not DeSousa's only operational ATM-related website, as he

also currently maintains an ATM-related website at www.hcinc.biz/home.nxg.  *Id.* ¶ 6.  This

third website, while also boasting that it is "under new management," is also virtually identical in

appearance and content to DeSousa's former website (www.hcinc.biz) and other current website

(www.acapitolatm.com).  *Id.*

**C.      DeSousa's post-plea agreement intent to leave the country and attempt to scam a payroll service**

On August 23, 2007, employees of Paychex, Inc. ("Paychex") contacted the United States

Attorney's Office by telephone to discuss their recent communications with DeSousa.  At the

direction of the United States Attorney's Office, Special Agent Lucjak contacted Ms. Chinyere

Ojukwu, a Paychex employee.  *See* Exhibit 1 (First Lucjak Dec.) at ¶ 3.  According to Ms.

Ojukwu, DeSousa called Paychex's office three or four times seeking payroll services.  *Id.* ¶ 4.

Following those calls, at DeSousa's request, Ms. Ojukwu stated that she met with DeSousa at the

Inner Harbor in Baltimore, Maryland to discuss Paychex's services.  *Id.*

During their meeting in Baltimore, Ms. Ojukwu stated that DeSousa informed her that he

wanted to use Paychex to provide payroll services to his company, which he identified to her as

HCI Communication Inc. ("HCI").  *Id.* ¶ 5.  DeSousa represented to her that HCI was involved in

a business related to ATMs.  *Id.*  As part of their discussions, DeSousa provided her with, among

other things, (1) a handwritten list of six separate bank accounts purportedly controlled by

DeSousa; (2) a voided check from a checking account in DeSousa's name from Chevy Chase

Bank; and (3) wiring instructions for an account in DeSousa's name at Bank of New York.

Copies of those documents are attached as Tab A to the First Lucjak Declaration.

During her meeting with DeSousa, he represented to her that DeSousa had at least

$83,000 in his bank account at Chevy Chase Bank that he would make available to Paychex to

use to issue payroll checks on behalf of HCI.  *Id.* ¶ 6.  DeSousa requested that Paychex transfer

the $83,000 advance for the payroll into five separate bank accounts identified and purportedly

controlled by DeSousa.  *Id.*  According to Ms. Ojukwu, DeSousa was adamant that Paychex

make the $83,000 available to DeSousa by Tuesday, August 28, 2007. *Id.* ¶ 7. DeSousa told her that he intended to travel to Sao Paulo, Brazil for three to four months and, then, travel to Costa Rica for an indefinite period of time. *Id.* According to DeSousa's now-expired passport, which the Secret Service seized as part of a search in 2004, DeSousa lived in Brazil before emigrating to the United States. Ms. Ojukwu inferred from DeSousa's statements that he intended to use a portion of the $83,000 payroll advance to pay for his travel to Brazil and Costa Rica. *Id.*

Following their meeting, Ms. Ojukwu ran a Google computer search using DeSousa's name, located the press release issued by the United States Attorney's Office announcing DeSousa's plea agreement in the instant matter, and immediately contacted the United States Attorney's Office about these events on Thursday, August 23, 2007. *Id.* ¶ 8. Paychex informed DeSousa on or around Friday, August 24, 2007, that Paychex would not provide payroll services to DeSousa or HCI because of credit risk concerns. *Id.* ¶ 9. Paychex did not, however, inform DeSousa about its discovery that DeSousa had pleaded guilty to the instant offenses. *Id.* As a result, Paychex did not attempt to determine whether DeSousa had $83,000 in his account at Chevy Chase Bank as he had represented to Paychex. *Id.*[1] Chevy Chase Bank's records reflect, however, that the balance in DeSousa's account was $374.99 as of August 30, 2007. DeSousa,

---

[1]     Paychex has been the victim of fraud in connection with its payroll services. Paychex's normal operating procedure is to make payroll advances to a customer before the customer provides the funding for the payroll to Paychex. That is, once Paychex confirms that a customer has funds available in the customer's account to pay for payroll, Paychex will advance the requested amount of funds to a customer, but there is a 12-15 hour window before Paychex obtains its reimbursement for the payroll from the customer. *Id.* ¶ 10. Paychex has been victimized in the past by customers that remove the funds from the customer's account during that 12-15 hour window in such a way that the customer obtains the payroll advance from Paychex, but does not reimburse Paychex for the payroll advance. *Id.* Ms. Ojukwu opined that DeSousa may have heard about this scam and been attempting to execute the scam on Paychex in an effort to steal the $83,000. *Id.*

moreover, had previously represented to the Probation Office that he had zero assets and received monthly net income of $300.  *See* PSR at page 12.

On September 13, 2007, based on the defendant's failure to abide by his conditions of release, this Court (with the defendant's consent) ordered that DeSousa remain detained pending sentencing.  *See* PSR ¶ 7.

<u>**SENTENCING FACTORS**</u>

Title 18, United States Code, Section 3553(a), provides factors the Court shall consider in sentencing a defendant.  These factors are discussed below numbered as they are in § 3553(a).

(1) **The nature of the offense:** The maximum statutory terms of imprisonment at issue here reflect the serious nature of the crimes committed by the defendant.  Mail fraud and wire fraud, with maximum statutory term of 20 years, are Class C felonies.  *See* 18 U.S.C. §§ 1341 and 1343.  Credit card fraud, another Class C felony, has a maximum statutory term of fifteen years.  *See* 18 U.S.C. § 1029(a)(5).

**The circumstances of the offense:** This case illustrates how one individual, operating out of a virtual fraud shack with no ethical scruples, can intentionally devise and execute fraud schemes that inflict financial misery on hundreds of individuals and numerous companies across multiple state lines.  The defendant's fraud schemes involved using aliases, numerous business names, several websites, different email addresses, and multiple office addresses and phone numbers.  They also involved using other people's Social Security numbers, without their permission, to obtain credit services, automated teller machine ("ATM") services and merchant accounts.  Once DeSousa fraudulently obtained the credit services and accounts, he inflicted financial pain upon hundreds of individuals and numerous companies.  Given that the fraud

7

schemes encompassed a two and a half year period as charged in the Information and have continued through the present, the defendant has been continuously engaging in one fraud scheme or another for over five years.

The entire purpose of these schemes was to rip off anyone who came into contact with the defendant. And, in that regard, the defendant was successful: he successfully (and intentionally) ripped off newspapers in Virginia and Tennessee, a delivery service (United Parcel Service), a credit service (Inland Finance Corporation), an ATM service (Concord EFS, Inc.), merchant account services (Cardservice International and Retriever Payment Systems), and over 400 individuals spread out amongst numerous states as well as the credit card companies that reimbursed the individuals for the defendant's fraudulent credit card charges. In short, every individual and entity the defendant touched through his schemes suffered some financial loss and received nothing positive in return. Instead, the only person to benefit from the defendant's scheme was the defendant. And his crimes ceased not because of any good conduct on his own part, but rather because he got caught.

**The history and characteristics of the defendant:** The defendant was professionally, emotionally and socially capable of not engaging in these crimes, but instead chose to engage in them intentionally and without remorse, particularly based on his post-plea agreement conduct. To his credit, the PSR reflects that the defendant was able to overcome an unstable upbringing, *see* PSR at ¶¶ 41-42, and earn a Bachelors degree in business from Boston University, *id.* at ¶¶ 43, 62, obtain his United States citizenship, *id.* ¶ 43, and serve his country in the United States Navy, *id.* ¶ 44. Throughout the relevant time period, the defendant suffered no mental, physical or emotional health issues. *Id.* ¶ 56-58. According to the PSR, since 2000, the defendant has

been self-employed and owned HCI vending, which purportedly furnished "candy vending machines" to various business establishments. *Id.* ¶ 66.[2]  The defendant, in short, was someone who should have known better than to defraud hundreds of individuals and numerous businesses, and who was capable of trying to earn through hard work the money he stole or sought to steal from his many victims.

In addition, the defendant has demonstrated no remorse since pleading guilty to these crimes.  As demonstrated above, the defendant failed to abide by his conditions of release that he (1) close down all ATM-related websites, and (2) refrain from committing any additional criminal offenses.  There can be no genuine dispute that the defendant has failed to close down all ATM-related websites following the plea hearing.  Instead, after representing to the government that he had shut down his ATM-related website in July 2007, *see* Exhibit 1 (First Lucjak Dec.) at ¶ 11, the defendant started a new one two weeks later and continued operating a third ATM-related website, *see* Exhibit 2 (Second Lucjak Dec.) at ¶¶ 4-6.

Even worse, it appears that the defendant engaged in two separate fraudulent schemes *after* the plea hearing.  First, he defrauded one individual out of $9600 by passing off used ATMs as new ATMs.  *See* Exhibit 1 (First Lucjak Dec.) ¶¶ 11-14.  Second, he attempted to scam Paychex out of $83,000 in payroll advances by falsely claiming to Paychex that he had at least that amount of money in his account at Chevy Chase Bank when, in fact, he had less than $400 in the account.  *Id.* ¶¶ 3-10.

---

[2]     The defendant apparently did not mention his ATM-related websites to the Probation Office.

(2)  The Court should also consider the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence; (C) to protect the pubic from further crimes of the defendant; and (D) to provide defendant with appropriate education or vocational training.  In this matter, as discussed above, the offenses were serious and require adequate punishment.

Given the continuous course of criminal conduct by the defendant over the past five years, there is a particular need here for the sentence to be of such a nature so as to promote respect for the law, to afford adequate deterrence and to protect the public from further crimes of the defendant.  Although the instant convictions are the defendant's first criminal convictions, his conduct since 2002 has demonstrated contempt for the law and his fellow citizens.  From 2002 through 2004, the defendant admitted to engaging in four separate fraud schemes: (1) a scheme to offer "grant information" to individuals; (2) a scheme to steal an individual's identity to provide credit services and ATM services; (3) a scheme to steal individuals' identity to open fraudulent merchant accounts to conduct credit card fraud; and (4) a scheme to defraud through an at-home massage company.  *See* PSR ¶¶ 8-16.  After filing the instant Information, the government discovered that the defendant engaged in a fifth fraudulent scheme using an internet website to pass off used ATMs as new ATMs, *see* Exhibit 1 (First Lucjak Dec.) at ¶¶ 11-14, and a sixth fraudulent scheme to obtain at least $83,000 from a payroll company, *id.* ¶¶ 3-10.  In the process, the defendant also wilfully failed to close out all ATM-related websites as directed by this Court.  The defendant's continuous and varied criminal conduct over a five year period, including the period *after* his plea agreement, demonstrates that he is an exceptionally poor candidate for rapid rehabilitation.

The circumstances of the offenses and the need to protect the public from further crimes of the defendant also support the imposition of the following special conditions:  (a) the defendant should obtain and maintain full employment following his release, with the circumstances of the defendant's employment at the discretion of the Probation Office, but subject to review by the Court; (b) he should not obtain any employment positions in which he will be responsible for or have access to another person's or business's or organization's financial assets or personal identifying information (specifically Social Security numbers); (c) he should neither directly nor indirectly incur credit card charges, open additional lines of credit, obtain access devices, or negotiate or consummate any financial contracts without the approval of the Probation Office; and (d) he should neither directly nor indirectly control, operate or own any websites without the approval of the Probation Office.

As to the final consideration, the defendant appears in need of further educational or vocational training.  The PSR reflects the defendant's repeated efforts to continue his education, though his reported lack of financial resources inhibited his ability to obtain a graduate degree. *See* PSR ¶¶ 59-61.  To the extent available, it appears that the defendant would benefit from educational or work programs available at the Bureau of Prisons.

(3) The Court should consider the kinds of sentences available.  The maximum term of imprisonment for wire and mail fraud is 20 years, with a term of supervised release of not more than 3 years.  The maximum term of imprisonment for credit card fraud is 15 years, with a term of supervised release of not more than 3 years.

(4)  The Court should also consider the sentencing range established by the United States Sentencing Guidelines ("USSG").  As to these guidelines, the government and the defendant had

stipulated in the plea agreement to a Total Adjusted Offense Level for the offense of 23 and a

Criminal History category I.  The government also agrees to a 2-level reduction, pursuant to

U.S.S.G. § 3E1.1(a), for the defendant's acceptance of responsibility with respect to the instant

charges.  Based on his post-plea agreement conduct, however, the government will not

recommend an additional 1-level reduction, pursuant to U.S.S.G. § 3E1.1(b).  *See* PSR ¶ 86.  The

resulting Total Offense Level, therefore, is 21 and a USSG range of 37-46 months.  Because of

the defendant's continuous criminal conduct and wilful failure to abide by his conditions of

release, the government recommends a sentence at the mid-point of that range of 41 months.[3]

The Probation Office believes that the defendant's resulting Total Adjusted Offense Level

for the offense should be 23, a Criminal History category I, and a resulting USSG range of 46 to

57 months.  PSR, at p. 7, ¶¶ 25-36, and p. 14, ¶ 85.  The two point difference in the Total Offense

Level between the parties' stipulation and the Probation Office's recommendation reflected the

Probation Office's decision to add a two-point enhancement for the defendant's unauthorized

transfer or use of any means of identification unlawfully to produce or obtain any other means of

identification.  *See* PSR ¶¶ 28-29.  The government takes no position on this additional two point

enhancement.

The parties stipulated that the applicable fine range at a Total Offense Level 20 (or 21) is

$7,500 to $75,000.  *See* U.S.S.G. § 5E1.1(c)(3).  The applicable fine range for a Total Offense

---

[3]     As part of the plea agreement, DeSousa agreed to waive appeal of any sentence within or
below the "Stipulated Guidelines Range" set forth in the plea agreement.  The Stipulated
Guidelines Range as set forth in the plea agreement was 33-41 months, which had assumed
DeSousa would receive an additional 1-level reduction pursuant to U.S.S.G. § 3E1.1(b), but left
the government free to withdraw that reduction based on his subsequent conduct.

Level 23, as recommended by the Probation Office, is $10,000 to $100,000.  The maximum fine is $250,000.  *See* PSR ¶ 98.

(6) The Court should consider the need to avoid unwarranted sentencing disparities among defendants with similar records.  Here, a guidelines sentence would help prevent such disparities between the defendant and similar defendants.

(7)  Finally, the Court should consider the need to provide restitution.  Here, the defendant should pay the following restitution: (a) $5,699.99 to Cardservice International, *see* PSR ¶¶ 18 and 103; and (b) $47,591.09 to United Parcel Service, *id.* ¶¶ 19 and 103.

## RECOMMENDATION

The defendant, through his recurrent refusal over the past five years to live a lawful life, particularly the criminal conduct engaged in by him after his plea agreement, has demonstrated no remorse for his conduct.  Remorse is a prerequisite for mercy, and granting mercy to a remorseless defendant does not tend to promote respect for the law.  Instead, granting mercy to a remorseless offender may breed contempt for the law by the offender and, in such a case as here, cynicism for the law by a community that may perceive such leniency as evidence that the courts treat white collar offenders differently – less harshly – than other criminals.

Accordingly, the government requests that the Court impose a sentence of 41 months incarceration, which is at the mid-point end of the guidelines range of 37-46 months.  *See United States v. Rita*, ___ U.S. ___, 127 S. Ct. 2456, 2465 (2007) ("when the judge's discretionary decision accords with the [Sentencing] Commission's view of the appropriate application of § 3553(a) in the mine run of cases, it is probable that the sentence is reasonable"); *United States v. Dorcely*, 454 F.3d 366, 376 (D.C. Cir. 2006) ("a sentence within a properly calculated Guidelines

13

range is entitled to a rebuttable presumption of reasonableness" by an appellate court). The

government also requests that the Court (1) impose a three year term of supervised release, (2)

require the defendant to pay restitution, and (3) impose special conditions that the defendant (a)

obtain and maintain full employment following his release, with the circumstances of the

defendant's employment at the discretion of the Probation Office, but subject to review by the

Court, (b) not obtain any employment positions in which he will be responsible for or have

access to another person's or business's or organization's financial assets or personal identifying

information (specifically Social Security numbers), (c) neither directly nor indirectly incur credit

card charges, open additional lines of credit, obtain access devices, or negotiate or consummate

any financial contracts without the approval of the Probation Office, and (d) neither directly nor

indirectly control, operate or own any websites without the approval of the Probation Office.


Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY
D.C. Bar Number 498610

By:        / s /                                        

MICHAEL K. ATKINSON
D.C. Bar No. 430517
Assistant United States Attorney
555 4th Street, N.W., Room 5915
Washington, D.C. 20530
DATED: October 15, 2007                    (202) 616-3702

14

# Exhibit 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 06-294 (JDB) |
| | : | |
| v. | : | |
| | : | UNDER SEAL |
| JOAQUIM DESOUSA, | : | |
| | : | |
| Defendant. | : | |

DECLARATION OF SPECIAL AGENT MATHEW LUCZAK
IN SUPPORT OF THE GOVERNMENT'S *EX PARTE* EMERGENCY
MOTION TO REVOKE DEFENDANT'S RELEASE PENDING SENTENCING

Special Agent Mathew Luczak of the United States Secret Service declares as follows:

A.    **Background**

1.    From December 2004 to the present, I have been employed as a Special Agent with the United States Secret Service. I have received from the Secret Service and other Federal agencies specialized training which has provided me with a background and basis of knowledge relating to the investigation of fraud, including but not limited to, wire fraud, mail fraud and credit card fraud, in violation of Title 18, United States Code, Sections 1341, 1343 and 1029(a)(5).

2.    I have been the lead case agent assigned to the investigation and prosecution of the defendant, Joaquim DeSousa, since November 2005. Based on information obtained through my investigation, I understand that DeSousa's last known address is 227 South Broadway Street, Room 11, Baltimore, Maryland 21224. Although Secret Service agents seized DeSousa's United States passport during a search in 2004, I also understand from my investigation that DeSousa obtained a new passport later in 2004. I believe that DeSousa retains possession of his new passport.

**B.    Investigation of DeSousa's Interaction with Paychex, Inc.**

3.      On August 23, 2007, at the direction of the United States Attorney's Office, I contacted Ms. Chinyere Ojukwu. Ms. Ojukwu is an employee of Paychex, Inc. ("Paychex"). She informed me that Paychex provides payroll services to small companies and individuals. She stated that she worked out of Paychex's office in Owings Mills, Maryland.

4.      Ms. Ojukwu informed me that she had recently met with DeSousa. According to Ms. Ojukwu, DeSousa called Paychex's office three or four times seeking payroll services. Following those calls, at DeSousa's request, Ms. Ojukwu stated that she met with DeSousa at the Inner Harbor in Baltimore, Maryland to discuss Paychex's services. At my request, she provided me with a physical identification of DeSousa that matched his physical appearance, including the fact that he was missing some of DeSousa's lower teeth.

5.      During their meeting in Baltimore, Ms. Ojukwu stated that DeSousa informed her that he wanted to use Paychex to provide payroll services to his company, which he identified to her as HCI Communication Inc. ("HCI"). I recognized the corporate name HCI from my investigation of DeSousa as the name of the company that he had operated that had been involved in the sale of automated teller machines or ATMs. According to Ms. Ojukwu, DeSousa represented to her that HCI was involved in a business related to ATMs. As part of their discussions, Ms. Ojukwu stated that DeSousa provided her with the following documents: (1) an Employer Identification Number form letter from the Internal Revenue Service for HCI; (2) a handwritten list of six separate bank accounts purportedly controlled by DeSousa; (3) a voided check from a checking account in DeSousa's name from Chevy Chase Bank; (4) wiring instructions for an account in DeSousa's name at Bank of New York; (5) a Paychex Services

2

Agreement executed by DeSousa; and (6) a Paychex Direct Deposit/Access Card authorizing

Paychex to deposit $14,000 in DeSousa's account at Bank of New York. Ms. Ojukwu provided

me with a copy of each of the documents, and I have attached them to this Declaration as Tab A.

6.      During her meeting with DeSousa, Ms. Ojukwu informed me that DeSousa

represented to her that he had enough money in his bank account at Chevy Chase Bank to cover

$83,000 in payroll that he sought from Paychex to use to issue payroll checks on behalf of HCI.

According to Ms. Ojukwu, Paychex's normal operating procedure would have been for Paychex

to run a credit check on DeSousa's bank account at Chevy Chase Bank to confirm that he had

$83,000 on deposit at the bank. If Paychex confirmed that amount on deposit at Chevy Chase

Bank, Ms. Ojukwu stated that Paychex would advance $83,000 (presumably less some amount

for Paychex's fee) to DeSousa/HCI to use for payroll services and concurrently obtain the

$83,000 from DeSousa's bank account at Chevy Chase Bank to reimburse Paychex for its payroll

advance. Ms. Ojukwu stated that DeSousa requested that Paychex transfer the $83,000 advance

for the payroll into five separate bank accounts identified and purportedly controlled by DeSousa.

7.      Ms. Ojukwu told me that DeSousa was adamant that Paychex make the $83,000

available to DeSousa by Tuesday, August 28, 2007. According to Ms. Ojukwu, DeSousa told her

that he intended to travel to Sao Paulo, Brazil for three to four months and, then, travel to Costa

Rica for an indefinite period of time. According to DeSousa's now-expired passport, which the

Secret Service seized as part of a search in 2004, DeSousa lived in Brazil before emigrating to

the United States. Ms. Ojukwu stated that she inferred from DeSousa's statements that he

intended to use a portion of the $83,000 payroll advance to pay for his travel to Brazil and Costa

Rica.

8.      Ms. Ojukwu told me that she considered DeSousa's immediate need for the

money to be odd. As a result, following their meeting, Ms. Ojukwu stated that she ran a Google

computer search using DeSousa's name. According to her, the search revealed the press release

issued by the United States Attorney's Office announcing DeSousa's plea agreement in the

instant matter. Following that search, Ms. Ojukwu stated that Paychex informed the United

States Attorney's Office about these events on Thursday, August 23, 2007.

9.      Ms. Ojukwu stated that Paychex informed DeSousa on or around Friday, August

24, 2007, that Paychex would not provide payroll services to DeSousa or HCI because of credit

risk concerns. She stated that Paychex did not inform DeSousa about its discovery that DeSousa

had pleaded guilty to the instant offenses. As a result, Paychex did not attempt to determine

whether DeSousa had $83,000 in his account at Chevy Chase Bank as he had represented to

Paychex. Even after Paychex informed DeSousa that it would not provide payroll services to

him, Ms. Ojukwu stated that DeSousa called her on her personal cell phone as part of an effort to

encourage her to continue to attempt to persuade Paychex to make the funds available to him.

10.     Ms. Ojukwu stated that Paychex has been the victim of fraud in connection with

its payroll services. She informed me that Paychex's normal operating procedure is to make

payroll advances to a customer before the customer provides the funding for the payroll to

Paychex. That is, once Paychex confirms that a customer has funds available in the customer's

account to pay for payroll, Paychex will advance the requested amount of funds to a customer,

but there is a 12-15 hour window before Paychex obtains its reimbursement for the payroll from

the customer. She informed me that Paychex has been victimized in the past by customers that

remove the funds from the customer's account during that 12-15 hour window in such a way that

4

the customer obtains the payroll advance from Paychex, but does not reimburse Paychex for the payroll advance. Ms. Ojukwu opined that DeSousa may have heard about this scam and been attempting to execute the scam on Paychex in an effort to steal the $83,000.

**C.     Investigation of DeSousa's Interaction with Julett Cox**

11.     On or about July 3, 2007, I received information from a complainant, Michael Luthor, that DeSousa continued to operate his website at www.hcinc.biz. Mr. Luthor also informed me that another individual, Ms. Julett Cox, had been defrauded by DeSousa as a result of the website. Following my receipt of this information from Mr. Luthor, I monitored DeSousa's website at www.hcinc.biz. The website remained active until July 9, 2007, when it was taken down.

12.     In addition, on July 13, 2007, I spoke with Ms. Julett Cox by telephone. Ms. Cox lives in St. Petersburg, Florida. Ms. Cox stated that her original contact with DeSousa was in March 2007, when she came across his web site, www.hcinc.biz, on the internet. She told me that DeSousa's website was advertising ATMs for sale. According to Ms. Cox, after she saw his website, she called DeSousa via telephone at 410-900-7912 to discuss the purchase of a couple new ATMs. I know from my prior investigation of DeSousa that the phone number provided by Ms. Cox is a telephone number used by DeSousa and was one of the phone numbers listed for HCI on its website. Ms. Cox stated that she told DeSousa at that time in March 2007 that she did not have the money to purchase the ATMs, but that she would be interested in purchasing them in the near future.

13.     Ms. Cox told me that she ultimately purchased the ATMs from DeSousa on May 1, 2007, when she wired DeSousa/HCI Communication $9400 for the purchase of two new

5

ATMs. Ms. Cox provided me with the wiring details for that transaction, which are attached hereto as Tab B. According to the wiring details, Ms. Cox wired $9400 to a Wachovia Bank account in Baltimore, Maryland in the name of HCl.Communication. Ms. Cox stated that she used her 401(k) account to make the purchase.

14.    According to Ms. Cox, the ATMs did not arrive from DeSousa until 3-4 weeks after she had wired him the money. She stated that when the machines finally arrived, they were old, used and beaten up. According to Ms. Cox, the machines are so outdated that someone told her that they would not be able to stock them with cash.

15.    Ms. Cox stated that DeSousa came to visit her in Florida in early May 2007 to discuss some business opportunities with her. She stated that DeSousa told her that he was interested in having her work for him by checking his pay pal accounts and possibly managing a real estate business that he was interested in starting up. Ms. Cox also stated that DeSousa told her that he kept all of his money in a bank in Australia.


I declare that the above is true and correct to the best of my information and belief.


_8/27/07_
DATE

_Mathew Luxc_
MATHEW LUCZAK
Special Agent
United States Secret Service

6

# TAB A

**IRS** DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
P.O. BOX 9003
HOLTSVILLE NY   11742-9003

002039.225753.0008.001 1 MB 0.326 992

HCI COMMUNICATION INC
3429 EASTERN AVE STE 33
BALTIMORE MD   21224

Date of this notice:  02-02-2006

Employer Identification Number:
14-1948070

Form:  SS-4

Number of this notice:  CP 575 A

For assistance you may call us at:
1-800-829-4933

IF YOU WRITE, ATTACH THE
STUB OF THIS NOTICE.

## WE ASSIGNED YOU AN EMPLOYER IDENTIFICATION NUMBER

    Thank you for applying for an Employer Identification Number (EIN).  We assigned
you EIN 14-1948070.  This EIN will identify your business account, tax returns, and
documents, even if you have no employees.  Please keep this notice in your permanent
records.

    When filing tax documents, please use the label we provided.  If this isn't
possible, it is very important that you use your EIN and complete name and address
exactly as shown above on all federal tax forms, payments and related correspondence.
Any variation may cause a delay in processing, result in incorrect correspondence in your
account or even cause you to be assigned more than one EIN.  If the information
isn't correct as shown above, please correct it using tear off stub from this notice
and return it to us so we can correct your account.

    Based on the information from you or your representative, you must file the
following form(s) by the date(s) shown.

            Form 1120                    03/15/2007

    If you have questions about the form(s) or the due dates(s) shown, you can call
or write to us at the phone number or address at the top of the first page of this
letter.  If you need help in determining what your tax year is, see Publication 538,
Accounting Periods and Methods, available at your local IRS office or you can download
this Publication from our Web site at www.irs.gov.

    We assigned you a tax classification based on information obained from you or
your representative.  It is not a legal determination of your tax classification,
and is not binding on the IRS.  If you want a legal determination on your tax
classification, you may request a private letter ruling from the IRS under the
guidelines in Revenue Procedure 2004-1,2004-1 I.R.B. 1 (or superseding Revenue
Procedure for the year at issue.)

① Citi BANK (c) _____ 486 Account        7500 ppp
   s.                        2166 Route          nk monthly

**Direct Deposit**
**Accounts**

② Citi Bank (s) _____ 3098N Account       7000 ppp
                              301166 Route        monthly

   B't Banking Officer

③ Western Union _____ 3535 Account         2000 monthly
                 091409568  Route                1000 ppp

                Credit
④ A G Edward _____ 2781 Account            18K
   ☒ Check by mail  _____   _____          check
                  Att: _____ _____ HCI/communication

Paye:
Tax ID # 14-1948070         c/o Mr Red (sur)
Joaquim DeSosa dba          AG Edward (sun)        28K PPP
HCI Communication Inc.      111 S. Calvert St.          monthly
                            Baltimore, Md 21202

⑤ Chevy Chase Bank                              28K PPP
                            _____ 2056 Account  monthly
   ✱ Pay into his acct.     25507/981 Route

⑥ Bank of New York                              14K PPP
                            Brokerage Account       PPP
                            30 Q 118546
                            ABA # 021000018
                            A/C _____ 2385
                            Client Name? JOAQUIM DeSOUSA

                            Th. Joaquim DeSousa

SS#: _ _ _ - _ _ - 2306

Balto, MD   21224

S-1 exemption

JOAQUIN G. DESOUSA T-A
HCI COMMUNICATION
3429 EASTERN AVE., STE. 33
BALTIMORE, MD 21224

(Void)

DATE

PAY TO THE
ORDER OF_____ $

_____ DOLL

CHEVY CHASE BANK
BETHESDA, MARYLAND 20814

FOR_____

⑈00 ⑆004⑈ ⑆2550 7 ⑆98 ⑈

## **Wire Instructions**

Bank of New York

One Wall Street
New York NY 10286

ABA # 021000018

F/A/O Pershing

A/C # _ _ _ _ _ 2385

Client's Name   Joaquim DeSusa den HC/Communication Inc

Client's Brokerage Account Number

~118546





New Book information

Company Name  HCI Communication, Inc

Office/Client Number  ___ ___ ___ ___ ___ / ___ ___ ___ ___ /

Federal ID Number  ___ ___ — ___ ___ ___ ___ ___ ___ ___

# Paychex Services Agreement

This Paychex® Services Agreement ("Agreement") is entered into between Paychex, Inc. ("Paychex"), located in Rochester, New York and the Company identified above ("Client"). The Agreement shall continue until terminated in accordance with its provisions. Paychex shall provide the services initialed below "Services"). Client shall also receive, at no charge, the Tax Credit Analysis Service as described below. Paychex will not commence any of the Services until Paychex receives all documents necessary to begin each of the Services and notifies Client of the date Paychex will commence each of the Services ("Service Effective Date"). Client acknowledges that each of the Services may have separate Service Effective Dates. Until the Service Effective Date, Client shall provide for itself the Services requested of Paychex. Paychex assumes no responsibility for services prior to the Service Effective Date.

### Taxpay®

On or before Client's check date, Paychex will (i) process EFT transactions for such amounts as are necessary to pay the payroll taxes that are specifically identified on the *Cash Requirements and Deposits Report*; (ii) hold such amounts in a separate Paychex account until such time as these amounts are due to the appropriate taxing authorities; and (iii) prepare, sign, and file with proper taxing authorities all returns for such taxes on an ongoing basis. Paychex is not responsible for the payment of taxes or the filing of returns prior to the Taxpay Service Effective Date or for payroll taxes that Paychex did not collect from Client. 1-800 State Unemployment Insurance Support Line: Paychex will provide Client with telephone assistance related to unemployment claims, pre-hearing preparation, voluntary contributions, tax rate questions, and benefit charge statements. Telephone assistance is obtained at 1-877-823-2953, State Unemployment Insurance option.

### State Unemployment Insurance Service (SUIS)

Paychex will provide the following services relating to unemployment insurance: claim and appeal processing, pre-hearing preparation, analytical review of voluntary contributions, and charge statement balancing. Client agrees to complete applicable Power of Attorney and Record of Address forms where needed.

### Readychex®

Paychex will (i) process EFT transactions, one or more banking days prior to Client's check date, for such amounts as are necessary to pay Client's employees; (ii) hold such amounts in an account established by Paychex until Client's check date; and (iii) draw checks payable to Client's employees on Client's check date and provide those checks to Client. Client shall distribute checks on check date or thereafter. Checks distributed to employees before check date will not be honored and it will be Client's responsibility to pay the employee. If Client's employee fails to present a check for payment within six (6) months of check date ("Stale Check"), Paychex will refund the amount debited for the Stale Check back to Client minus any balances owed by Client and charge a fee for the transfer of the Stale Check funds back to Client. Client shall be solely responsible for remitting to its employee, or former employee, any amounts due and following any state unclaimed property laws in regards to outstanding employee funds.

### Direct Deposit/Access Card

Paychex will process EFT transactions, one or more banking days prior to Client's check date, for such amounts as are necessary to pay Client's employees. Such amounts are to be held in an account established by Paychex until Client's check date, when funds shall be deposited to employee accounts as specified.

### Check Signing

Paychex will use Client's signature to create a computer-generated facsimile that will display on each of Client's payroll checks each payday.

### Check Insertion

Paychex will insert Client's signed checks into individual employee envelopes that will be sealed and returned to Client.

### Logo Service

Paychex will use Client's logo to create a computer-generated facsimile that will display on each of Client's payroll checks. Client warrants that Client is the owner of any logo it authorizes Paychex to use, has full right and authority to use it on its payroll checks, and that such use does not violate any other party's rights.

### Premium Only Plan (POP)

Paychex will act as Plan Service Provider for Client's POP. Paychex will prepare the Plan Document, Adoption Agreement, and Summary Plan Description, and perform compliance testing.

### Garnishment Payment Service

Paychex will process EFT transactions, one banking day prior to Client's check date, for Client's employees' garnished wages as are necessary to remit to the appropriate entities. Client shall provide Paychex with a garnishment order for each employee for whom wages are to be garnished. Paychex shall hold garnished wages in a separate account established by Paychex until such time as the amounts are due. Client remains solely responsible for the correct calculation of the amount to garnish from its employees' wages.

### Tax Credit Analysis Service

Paychex will review Client's payroll information to determine Client's eligibility for various federal and/or state location based tax credits available to eligible business owners through various federal and state tax credit programs. If Client appears eligible for a tax credit, Paychex may contact Client to explain the Tax Credit Service, which is available for an additional charge.

**Client agrees that Paychex is not rendering legal, tax, accounting, or investment advice in connection with the Services, nor shall Paychex be deemed a fiduciary of Client or the employer or joint employer of Client's employees.** Paychex shall not be responsible for Client's compliance with, nor shall it provide legal or other financial advice to Client, with respect to federal, state, and local laws or ordinances. Client shall agree to comply with any and all applicable federal, state, and local laws or ordinances.

Client understands that this Agreement (Rev. 11/05) may be considered an application for credit and hereby authorizes Paychex to investigate the credit of the Client and/or its principals, including vendor references, bank account status, and history (collectively "Client's Credit"). Paychex' performance of the services under this Agreement is subject to approval of Client's Credit. Client warrants that it possesses full power and authority to enter into this Agreement, and has read and agrees to the terms and conditions of this Agreement.

Authorized Officer's Name  Joaquim DeSousa     Title  President
                                   PRINT

Authorized Officer's Signature  X _____     Date  Aug 22, 07

## Reporting Agent Authorization

(In accordance with IRS Form 8655)

OMB No. 1545-1058

### Taxpayer

1. Employer identification number (EIN)

2. Other identification number (State ID)

3. If you are a seasonal employer, check here ............ ☐

4. Name of taxpayer (as distinguished from trade name)

HCI COMMUNICATION INC

5. Trade name, if any (DBA)

6. Address (number, street, and room or suite no.)

City or town     State     ZIP code

7. Contact person

8. Telephone number     9. Fax number

### Reporting Agent

10. Name

P A Y C H E X   I N C

11. Employer identification number (EIN)

1 6 - 1 1 2 4 1 6 6

12. Telephone number

5 8 5 - 3 3 6 - 7 6 0 0

13. Address

9 1 1   P A N O R A M A   T R A I L   S O U T H

City or town

R O C H E S T E R

State

N Y

ZIP code

1 4 6 2 5 - 0 3 9 7

### Authorization of Reporting Agent To Sign and File Returns

14. Use the entry lines below to indicate the tax return(s) to be filed by the reporting agent. Enter the beginning year of annual tax returns or beginning quarter of quarterly tax returns. See the instructions for how to enter the quarter and year. Once this authority is granted, it is effective until revoked by the taxpayer or reporting agent.

940 ☐    941 ☐ / ☐    944 ☐

### Authorization of Reporting Agent To Make Deposits and Payments

15. Use the entry lines below to enter the starting date (the first month and year) for which the reporting agent is authorized to make deposits or payments. See the instructions for how to enter the month and year. Once this authority is granted, it is effective until revoked by the taxpayer or reporting agent.

940 ☐ / ☐    941 ☐ . ☐    944 ☐

### Disclosure of Information to Reporting Agents

16a. Check here to authorize the reporting agent to receive or request copies of tax information and other communications from the IRS related to the authorization granted on line 14 and/or line 15 ............................................................................................... ☐

b. (Do not check this box, see instructions.) Check here if the reporting agent also wants to receive copies of notices from the IRS ............ ☐

### Form W-2 series or Form 1099 series Disclosure Authorization

17a. The reporting agent is authorized to receive otherwise confidential taxpayer information from the IRS to assist in responding to certain IRS notices relating to the Form W-2 series information returns. This authority is effective for calendar year forms beginning

b. The reporting agent is authorized to receive otherwise confidential taxpayer information from the IRS to assist in responding to certain IRS notices relating to the Form 1099 series information returns. This authority is effective for calendar year forms beginning

### State or Local Authorization

18. Check here to authorize the reporting agent to sign and file state or local returns related to the authorization granted on line 14 and/or line 15 ......... ☐

### Authorization Agreement

I understand that this agreement does not relieve me, as the taxpayer, of the responsibility to ensure that all tax returns are filed and that all deposits and payments are made. If line 14 is completed, the reporting agent named above is authorized to sign and file the return indicated, beginning with the quarter or year indicated. If any starting dates on line 15 are completed, the reporting agent named above is authorized to make deposits and payments beginning with the period indicated. Any authorization granted remains in effect until it is revoked by the taxpayer or reporting agent. I am authorizing the IRS to disclose otherwise confidential tax information to the reporting agent relating to the authority granted on line 14 and/or line 15, including disclosures required to process Form 8655. Disclosure authority is effective upon signature of taxpayer and IRS receipt of Form 8655. The authority granted on Form 8655 will not revoke any Power of Attorney (Form 2848) or Tax Information Authorization (Form 8821) in effect.

I certify I have the authority to execute this form and authorize disclosure of otherwise confidential information on behalf of the taxpayer.

Signature ▶ _____ Title _____ Date _____

REQUIRED                                                                        REQUIRED

For Privacy Act and Paperwork Reduction Act Notice, see reverse.    Office/Client number ___ ___ / ___    Rev. 10/05

TIA

| **Paychex Use Only** |
|---|
| Client Number _____ |
| Worker Number _____ |
| PRS _____ |
| Date _____ |
| Verified By _____ |

# PAYCHEX

## Direct Deposit/Access Card
## Signup Form

**Worker Instructions:**

1. Complete the "WORKER – Required Information" section.
2. Complete the Direct Deposit, Access Card, or both sections to specify where you want your pay deposited.
3. Sign the bottom of the form.
4. Retain a copy of this form for your records. Return the original to your employer.

**Employer Instructions:**

1. Complete the "EMPLOYER – Required Information" section.
2. Return this form to your local Paychex office.*
* See below for acceptable bank account documentation. Deposit slips are not accepted.

## WORKER – Required Information

*PLEASE PRINT*

Worker Name  Joaquim DeSousa

## EMPLOYER – Required Information

*PLEASE PRINT*

Company Name _____

Office/Client Number _____

Federal ID Number __ __ __ __ __ __ __ __ __

## Complete for DIRECT DEPOSIT and Sign Below

I authorize my employer to deposit my wages/salary to the following bank account(s):

**Bank Account #1**  ☑ Checking  ☐ Savings

Bank Name  Bank of New York

I wish to deposit (check one):

☐ Entire Net Pay

☐ _____ % of Net

☑ Specific Dollar Amount $ 14,000.00

Please attach one of the following (check one):

☐ Voided check (deposit slips are not accepted)

☐ Bank letter or specification sheet*
*See your local bank representative.

**Bank Account #2**  ☐ Checking  ☐ Savings

Bank Name _____

I wish to deposit (check one):

☐ Entire Net Pay

☐ _____ % of Net

☐ Specific Dollar Amount $ _____ .00

Please attach one of the following (check one):

☐ Voided check (deposit slips are not accepted)

☐ Bank letter or specification sheet*
*See your local bank representative.

## Complete for ACCESS CARD and Sign Below

I authorize my employer to deposit my wages/salary to an Access Card account. I agree to the terms and conditions of the Paychex Access Card Program including the $2.00 monthly maintenance fee, the $1.50 per ATM withdrawal fee, the $3.00 over-the-counter cash advance fee, and the $15.00 lost or stolen card replacement fee.

I wish to deposit (check one):

☐ Entire Net Pay  ☐ _____ % of Net  ☐ Specific Dollar Amount $ _____ 00

Please print the address where the Access Card statements should be mailed.

Street Address _____  Apt. # _____

City _____  State _____  Zip _____

Home Phone No. ( __ __ __ ) __ __ __ - __ __ __ __

### Please also complete corresponding sections on page 2

Worker Signature (X) _____  Date __ __ / __ __ / __ __ __ __
By signing above, I am agreeing that I am either the accountholder or have the authority of the accountholder to authorize my employer to make direct deposits into the named account.

Accountholder Signature _____
If worker doesn't have authority to authorize deposits to the accountholder's account.

DPC002 3.07

TAB B

3001 58th Ave S Apt 1013    St Petersburg    FL

| Customer ID/Type | | | | |
|---|---|---|---|---|
| 1. FL DL | 1. C200-421 | 1. FL | 1. 07/19/03 | 1. 03/02/10 |
| 2. BOA visa ck cd | 2. N/A | 2. N/A | 2. N/A | 2. N/A |

## Section II: Customer Requested Wire

| Associate Name | Phone and Fax # | Unit Cost/COX | Date | Time |
|---|---|---|---|---|
| Yvette Borges | 727-350-6776  F | 075/100206 | 5/1/07 | 9.18am |

Callback Required if Phone, Fax or Letter ☐ Yes ☒ N/A   Name of Person Contacted   Date/Time   Approval (request)/Market Approval (request)

Callback Completed by:

## Section III: Domestic Payment Instructions

| Amount of Wire | Debit Account Type (circle one) | Serial # (For ICA/GL) or Repetitive ID# | Source | ☒ OTC |
|---|---|---|---|---|
| $ 9400 00 | CHKG  SAV  ICA  GL | | ☐ Fax  ☐ Phone  ☐ Letter | |

| Account to Debit | State | Available Balance | Account Title |
|---|---|---|---|
| 24543 | FL | 15,515 10 | Julett A Cox |

| Overdraft Amount | Overdraft Approved by (Name & Signature) | Date | Wire Fee |
|---|---|---|---|
| | | 5/1/07 | $ 25 00 |

## Section IV: International Payment Instructions (Send in foreign currency unless this box is checked)

| USD Amount of Wire | Country | Rate | Foreign Currency Amount | FX Reference ID (if applicable) |
|---|---|---|---|---|
| $ | | | | |

| Debit Account Type (circle one) | Serial # (For ICA/GL) or Repetitive ID# | Source | ☐ OTC |
|---|---|---|---|
| CHKG  SAV  ICA  GL | | ☐ Fax  ☐ Phone  ☐ Letter | |

| Account to Debit | State | Available Balance | Account Title |
|---|---|---|---|
| | | $ | |

| Overdraft Amount | Overdraft Approved by (Name & Signature) | Date | Wire Fee |
|---|---|---|---|
| | | | |

## Section V: Wire Information

| Beneficiary Name | Beneficiary Account # OR IBAN (if IBAN, no further Beneficiary Bank information is required) |
|---|---|
| ACI Communication | 4048 |

| Beneficiary Address  Street | City | State | Country | Zip |
|---|---|---|---|---|
| # JC | Baltimore | MD | | |

| Beneficiary Bank Name | ABA # or SWIFT or National ID |
|---|---|
| Wachovia | 0540001220 |

| Beneficiary Bank Address  Street | City | State | Country | Zip |
|---|---|---|---|---|
| | Baltimore | MD | | |

Additional Instructions (Attention To, Phone Advise, Customer Reference, Contact Upon Arrival)

Send Thru Bank/IBK (if available)                ABA # or SWIFT or National ID

Send Thru Bank Address  Street          City          State     Country     Zip

## Section VI: Customer Approval

I authorize Bank of America to transfer my funds as set forth in this instruction sheet, herein (including debiting my account if applicable), and agree that such transfer of funds is subject to the Bank of America standard transfer agreement (see reverse side) and applicable fees. If this is a foreign currency wire transfer, I accept the conversion rate provided in Section IV or, if no rate is entered, the rate provided by Bank of America at the time the wire transfer is sent.

| Customer's Signature: | Date of Request: 5/1/07 |
|---|---|

### BAT Approval Authorization (if applicable)

| Wire Entered by: Name/Signature (attach BFT screen prints) | BFT System Time  8.20.29 | BFT Sequence #  010705010003 |
|---|---|---|
| Print: Yvette Borges  Signature: | | |

| Date of Entry and Verification | Verified By (Name/Signature) (Print Verification Screen) | | BFT System Time |
|---|---|---|---|
| | Print: | | |

**Note: Purpose of Wire must be disclosed if sent to an OFAC blocked entry. See TAO.nw.help.block.entry**
**When debiting internal account/ICA, send original to National Channel Ops (SC3-250-02-39)**

95-14-0237H  08-2005          White-National Channel Operations (if internal account debited)   Yellow-Customer   Pink-Banking Center

Exhibit 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA  :    Criminal No. 06-294 (JDB)
                          :
            v.            :
                          :
JOAQUIM DESOUSA,          :
                          :
        Defendant.        :

## DECLARATION OF SPECIAL AGENT MATHEW LUCZAK IN SUPPORT OF THE GOVERNMENT'S SENTENCING MEMORANDUM

Special Agent Mathew Luczak of the United States Secret Service declares as follows:

### A.    Background

1.    From December 2004 to the present, I have been employed as a Special Agent with the United States Secret Service.  I have received from the Secret Service and other Federal agencies specialized training which has provided me with a background and basis of knowledge relating to the investigation of fraud, including but not limited to, wire fraud, mail fraud and credit card fraud, in violation of Title 18, United States Code, Sections 1341, 1343 and 1029(a)(5).

2.    I have been the lead case agent assigned to the investigation and prosecution of the defendant, Joaquim DeSousa, since November 2005.

### B.    Investigation of DeSousa's Interaction with Paychex, Inc.

3.    In August 2007, I received information from employees at Paychex, Inc. ("Paychex") concerning interactions between Paychex, which provides payroll services to small companies and individuals, and Mr. DeSousa.  In early September 2007, Paychex provided a written report of its interaction with Mr. DeSousa.  Included in the written report was a reference to a statement made by Mr. DeSousa to a Paychex

employee concerning a website that Mr. DeSousa stated that he operated at
www.acapitolatm.com.

4.    I accessed the internet and determined that www.acapitolatm.com was an
operational website offering ATM-related equipment. This website was virtually
identical in appearance and content to Mr. DeSousa's original ATM-related website at
www.hcinc.biz. For instance, despite advertising that www.acapitolatm.com was "under
new management," I recognized the phone number (410-900-7912) and email address
(globalatms@yahoo.com) as those used in the past by Mr. DeSousa. Based on
information provided at www.register.com, I determined that Mr. DeSousa started the
website at www.acapitolatm.com on July 24, 2007, which was approximately two weeks
after he closed down his original website at www.hcinc.com. I also determined that
www.acapitolatm.com was registered to an address at 3429 Eastern Avenue,
Baltimore, Maryland, which is an address previously used by Mr. DeSousa. A copy of
the website pages for www.acapitolatm.com is attached hereto as Tab A. The website
at www.acapitolatm.com is currently operational.

5.    As part of my investigation, I called the phone numbers listed on the
website at www.acapitolatm.com (1-800-725-6956 or 1-866-537-4402). The first phone
number (1-800-725-6956) was out of service. In calling the second phone number (1-
866-537-4402), I reached an individual who identified herself as Ms. Kayla Ealy, who
stated that she lived in Orlando, Florida. According to Ms. Ealy, she had answered an
internet advertisement and talked to a "Jack" DeSousa, one of Mr. DeSousa's known
aliases, about partnering with him for ATM sales. According to Ms. Ealy, she and Mr.
DeSousa agreed to split any profits from the sales of ATMs obtained through

2

www.acapitolatm.com. Ms. Ealy stated that she began working for Mr. DeSousa at the
end of August 2007. She also stated that she was unaware of any sales consummated
through the website.

6.      As part of my investigation, I also ran a Google search on the phone number used
as part of the website www.acapitolatm.com (866-537-4402). My Google search led me to
another ATM-related website at www.hcinc.biz/home.nxg. This second website, though
boasting that it, too, was "under new management," was virtually identical in appearance and
content to Mr. DeSousa's websites at www.hcinc.biz and www.acapitolatm.com. A copy of the
website pages at www.hcinc.biz/home.nxg is attached hereto at Tab B. The website at
www.hcinc.biz/home.nxg remains currently operational.


I declare that the above is true and correct to the best of my information and belief.


10/15/07
DATE

                                MATHEW LUCZAK
                                Special Agent
                                United States Secret Service

3

Tab A

Case 1:06-cv-00294-JDB   Document 25-3   Filed 10/15/2007   Page 6 of 14



**ACapitol ATM**

HOME

CONTACT US

SEE OUR ATMs

**Process Is NOT Required With Us**
**We Also Do Leasing   •   Se Habla Español**

**UNDER NEW MANAGEMENT**

**OVER 4000
ATM
LOCATIONS
NATIONWIDE**

## Over 4000 ATM Locations Nationwide • No Less Than

**ACapitol ATM** is a wholesale company that has quality **NEW and US**
machines. We are open 24/7. Our new ATM Machines are priced from $3695.0
includes taxes and shipping.



**We Have All Types of New and Used ATM Ma**

If you buy 10 or more ATM Machines from us, we will giv
ATM Machines absolutely free. We also have over 2000 gr
locations nationwide at establishments such as strip clubs,
sports bars, gas stations and many more.  No less th.
transactions a month with a long-term contract.

For example, if you have 100 locations, you charge $4.0
per surcharge, each location does 1000 transactions per
your total volume per month = $400,000.00, which is
return, you do the math.

Call us at (877) 455-3332 or (866) 537-4402
or e-mail us with questions at
wholesalesbuiness@msn.com
globalatms@yahoo.com

We are open 24 hours a day, 7 days a week.

**E-MAIL?**
**Click here to send**
**your questions or**
**to order Your**
**Moneymaking**
**Machines Now!**

**We Are Open
24 Hrs a Day
7 Days a Week**

 



## Call At Our Main (800) 725-6956 Or (866)537 4402



Baltimore, MD 21224

Case 1:08-cr-00224-JDB    Document 85-2    Filed 10/15/2007    Page 7 of 14

**(410) 900-7912**     **ALSO VIEW US ON** 

## Purchase 1000 ATM Machines & Get

### Referral Program

**Refer an associate and get $100**
**(When they buy an ATM)**

**Refer 100 associates and get**
**$1000 bonus from us!**

Tab B



**HOME**

**CONTACT US**

**SHOP ONLINE**

**E-MAIL?**
Click here to send
your questions or to
order Your
Moneymaking
Machines Now!

**We are open
24-Hrs a Day
7 Days a Week**

**(800) 725-6956**



**What Are You
Waiting For?**

**Pick Up The Phone &
Order Your
Moneymaking
Machines Now!**

**(877) 455-3332
(866) 537-4402**

 



### Process Is NOT Required With Us
### We Also Do Leasing ● Se Habla Español
### Over 4000 ATM Locations Nationwide ● No Less Thi

### <u>UNDER NEW MANAGEMENT</u>

**HCI** is a wholesale company that has quality **new and used** ATM machines. We are open 24/7. Our new ATM Machines range from $2395.00, which includes taxes and shipping.

**We have all types of new and used ATM Machines.** If you buy 10 or more ATM Machines from us, we will give you 2 ATM Machines absolutely free. We also have over 2000 great ATM locations nationwide at establishments such as strip clubs, casinos, sports bars, gas stations and many more. No less than 1000 transactions a month with a long-term contract.

For example, if you have 100 locations, you charge $4.00 dollars per surcharge, each location does 1000 transactions per month, your total volume per month = $400,000.00, which is a great return, you do the math.

Call us at (877) 455-3332 or (866) 537-4402
or e-mail us with questions at
**wholesalebuiness@msn.com**
**globalatms@yahoo.com**

We are open 24 hours a day, 7 days a week.

### Call At Our Main (800) 725-6956 Or (866)537 4402

### ALSO VIEW US ON 

## Purchase 1000 ATM Machines & get a I

We have available new and used:

- **9100 Triton - $2695, (New) including shipping**
- **9600 Triton - $1995 (Used)**



Shipping & Tax Included



**TRITON -$2695**
Shipping & Tax Included

- **9700 - $2395**

- **Tidel 1000s - $1995 (Used)**

- **MiniBank Cross1000 & 2000 - $1995 (Used)**

- **And More...**



**NANO - $7395**
Shipping & Tax Included

### Buy...

- **10 ATM Machines & Get 1 Free.**

- **50 ATM Machines & Get 2 Free.**

- **100 ATM Machines & Get 10 Free.**

- **200 ATM Machines & Get A Round Trip To The City Of Your Choice In The U.S.**

**Purchase 1000 ATM Machines & get a MILLION**



**NANO - $7395**
Shipping & Tax Included

**NANO - $7395**
Shipping & Tax Included

## Low Low Prices
## Quality Products

### What our customers are saying...

We needed a high volume machine and we came across HCI. We were skeptical at first but imagine our surprise when it got here. It arrived on time and the men were very well mannered and organized. They were also very helpful. Thanks so much.
*ATM Corp.*

I had my machine in one location for 30 days and I was making well over $5000! What a great location HCI helped me pick out.
*Jeff*

Quality Wholesale ATM's, one of the best ATM companies around in the ATM business!
*Business Week*

Purchased a location from HCI and couldn't believe my eyes. HCI gave me a casino location and started earning over $30,000 a month. I decided to quit my job thanks to HCI.
*Mr. Stokes*

**ALSO VIEW US ON** ebY

## We Serve Nationwide

## We Also Do Leasing

### Referral Program

**Refer an associate and get $100
(When they buy an ATM)**

**Refer 100 associates and get $1000 bonus from us!**

**Hit Counter**
10,517

Site Manager Sign In

Powered by superpages.com



**Home**   **Contact Us**   **Shop Online**

## Shop Online

All item pricing includes shipping fees and taxes. We have new and used ATMs available.



**Nano ATM**

Price: USD $7,395.00

BUY THIS ITEM



**MiniBank Cross 1000 (Used)**

Price: USD $1,995.00

BUY THIS ITEM



**MiniBank Cross 2000 (Used)**

Price: USD $1,995.00

BUY THIS ITEM

**Tidel 1000 (Used)**

Price: USD $1,995.00

BUY THIS ITEM



**Tidel 3100**

Price: USD $3,200.00

BUY THIS ITEM



**Tidel 3400**                                                    Price: USD $4,200.00

BUY THIS ITEM

**Triton RT 2000**                                               Price: USD $5,450.00

BUY THIS ITEM

**Triton RL 5000**                                               Price: USD $3,795.00

BUY THIS ITEM

**Triton 8100**                                                  Price: USD $2,650.00

BUY THIS ITEM

**Triton 9100 (Used)**                                           Price: USD $1,995.00

BUY THIS ITEM

**Triton 9100 (New)**                                            Price: USD $2,695.00

BUY THIS ITEM

**Triton 9600 (Used)**                       Price: USD $1,995.00

BUY THIS ITEM

**Triton 9700**                                                  Price: USD $2,395.00

BUY THIS ITEM

**Tranax 1500 (New)**                                            Price: USD $2,695.00



BUY THIS ITEM

**Price: USD $2,000.00**

### Long-Term Contract
3 year contract for a one-time fee of $2000 per location. Each location does no less than 900 transactions per month!

BUY THIS ITEM

**Price: USD $132,000.00**

### Vending Machine/Route Nationwide
3-year contacts no less than 15,000 a month.Over 4,000 left Nationwide.275 vending machines and 275 routes.Must sell a long term contract.

BUY THIS ITEM



PayPal*

Site Manager Sign In

Powered by superpages.com