IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Crim. No. 06-294 (JDB) |
| ) | |
| JOAQUIM DESOUSA, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

Mr. Joaquim DeSousa, by his attorney, hereby respectfully submits this Memorandum in Aid of Sentencing. Based on all of the sentencing factors in this case, the defense respectfully submits that the Court should sentence Mr. DeSousa to no more than 24 months imprisonment.

**BACKGROUND**

A.   **Joaquim DeSousa.**

Mr. DeSousa was born on April 21, 1959 in the Republic of Cape Verde, an island nation off the western cost of Africa. He was raised in Brazil. When Mr. DeSousa was nine years old, his parents came to America for a better life along with Mr. DeSousa and his older brother, Rionaldo. After a few years, Mr. DeSousa's parents divorced, leaving young Mr. DeSousa and his brother in the care of Mr. DeSousa's mother. Mr. DeSousa's mother struggled to find a decent job. This was very difficult for Mr. DeSousa given her lack of education and the language barrier.

After a while, due to stress, Mr. DeSousa's mother had a stroke. Mr. DeSousa and his brother, Rionaldo, were placed in an orphanage in New Bedford, Massachusetts. Mr. DeSousa would never see his mother or brother again.

Mr. DeSousa was transferred to an orphanage in Plymouth, Massachusetts and placed with a foster couple that could not have children. He was a stranger in their home. At the beginning the couple was nice, yet he could see that all they cared about was the money they received from the foster care agency by having him in their home. The couple did not attend church, or attend his school activities. Mr. DeSousa enjoyed school very much. He excelled in math, science and began to make friends. He was very outgoing, yet when he returned home from school he was in a shell. The couple would yell at him for no reason, which Mr. DeSousa could not understand. His grades were very good, and his teachers informed him that with good grades, he could achieve anything.

Mr. DeSousa often thought of his brother, knowing that one day with God's help, they would reunite. As time went by, he enjoyed soccer games at his school, Plymouth-Carver. His teammates enjoyed playing with him, because they won many games. Yet the couple he lived with never attended his soccer games. They never supported him. They informed him that he "wouldn't amount to anything." Mr. DeSousa reports feeling depressed throughout this period in his life, but he also remembers that going to school made him very happy.

After Mr. DeSousa graduated, he received soccer scholarships for Boston University and other schools. He was very happy when he graduated, even though his soccer coach from Plymouth-Carver was the only one who attended his graduation. The couple whom he lived with never attended. Mr. DeSousa's high school coach told him to always believe in himself, and to "do the right thing, opportunities will open for you."

After graduation from Plymouth-Carver, Mr. DeSousa attended Boston University and lived in a dormitory for the fall. He wanted to study business. As he practiced with his college

soccer team, he could see he had a lousy team. Their first game, against Brown University, was a 6-0 loss. In class, Mr. DeSousa took basic a basic course load and did well. After soccer season was over, Mr. DeSousa had to find a job full-time to support himself during the winter.

Mr. DeSousa found a job washing dishes at a restaurant in Roxbury, Massachusetts. He was very happy. He never heard from the couple he had lived with in Plymouth. It was better for him to forget them. Mr. DeSousa found a rooming house in Roxbury, and kept to himself. He worked at the restaurant from 4pm - midnight. During the day, he would sell <u>Boston Globe</u> newspapers, so he could have money for the subway to work.

Mr. DeSousa attended Boston University full time for two years, but unfortunately had to quit the soccer team in order to support himself. He finished his education at Boston University by attending summer school for three years, while working at the restaurant. Mr. DeSousa's employer at the restaurant, Mr. Weinstein, helped him acquire his citizenship papers, so he could stay in the United States legally. Mr. DeSousa will never forget Mr. Weinstein. Mr. Weinstein stressed that in America, education and hard work are the only way to succeed.

Around 1985, Mr DeSousa wanted to join the Navy, so he could continue his education. He saw a sign "join the Navy, the Navy can help you with education." He applied, passed the test, and took his physical examination. Mr. Weinstein took him to the Greyhound bus station in Boston that would take him to Great Lake, Illinois.

Mr. DeSousa boarded the bus and waved goodbye to Mr. Weinstein. Mr. Weinstein had become something of an adoptive father to Mr. DeSousa, and was sad for Mr. DeSousa to leave. And yet, Mr. Weinstein encouraged Mr. DeSousa and was happy that Mr. DeSousa was working to change his life for better. It took two days for Mr. DeSousa to reach Great Lake, Illinois by

bus. As he set on the bus looking out the window, Mr, DeSousa reflected on his life, and asked God to help him prepare for the Navy.

When he arrived, Mr. DeSousa had to quit smoking. His wake-up call was at 4 a.m., and he saw that the drill sergeant was mean and disciplined. All the new people had to shave their hair, polish their boots, and take orders: yes, sir/no, sir. When Mr. DeSousa took a second physical examination, he was informed that he couldn't hear in his left ear. The Navy informed Mr. DeSousa that he was going to get a medical honorable discharge.

After receiving his medical discharge, Mr. DeSousa went back to Boston with the bus ticket that the Navy provided him. While riding the long trip back to Boston on the bus, he asked himself "what will I do? Where is my future?" At this time and others, Mr. DeSousa reports thinking of his mother and brother, and wondering where they were. When Mr. DeSousa reached Boston, he called the restaurant to see if Mr. Weinstein would give him his job back. He was informed by a woman that Mr. Weinstein had sold the restaurant and relocated. Mr. DeSousa asked if her if she knew where he could find Mr. Weinstein and she said, "no."

It was winter (February of 1986) in Boston, and Mr. DeSousa had no money, no place to stay, and was afraid. Mr. DeSousa asked God to help him. He slept under the subway just to stay warm. He would go to the Pine Street Shelter and was turned away, as there were no more beds. Mr. DeSousa reports prolonged periods of feeling dizzy and hungry. Mr. DeSousa saw people selling newspapers - <u>the Boston Globe</u> - and asked if he could get a job selling newspapers part-time. Mr. DeSousa had to be at a certain place (Cambridge) by 6 a.m. to sell the newspapers. With no money, and hungry, Mr. DeSousa begged for money that he could go to Cambridge on the subway to sell the newspapers.

Mr. DeSousa finally made it to Cambridge and sold newspapers for $1 on Sunday. After paying the supervisor his fee, he had $30 dollars. He was so happy. He went to McDonalds to eat. He was offered a job at McDonald's part-time and also worked selling papers part-time during the early morning. At least he did not have to beg, as he had money in his pocket.

During the fall of 1989, Mr. DeSousa determined that he wanted to advance his education. He applied for graduate school in Washington, D.C. and was accepted. Mr. DeSousa used the money he saved from the paper route and the McDonald's job to purchase a bus ticket to Washington, D.C.

Once he arrived in Washington, he had to find a place to live and a job. For a while, he stayed at a homeless shelter in Northeast. He applied for a job at a group home and was very happy that they offered him a full-time position of caring for the disabled clients. Mr. DeSousa would implement programs for the clients and take them to religious services. While he was learning the city (southeast, northeast etc.), he would take the Metro bus, until he learned the city very well. Mr. DeSousa did not have to beg, because he had a job. Yet, because he was from out-of-state, tuition at graduate schools was very high. Mr. DeSousa could not afford to attend graduate school until he saved enough funds. He continued to work in order to save.

In 1999, Mr. DeSousa saw an ad on the television by Matthew Lesko, concerning information about "government grants."[1] Mr. Lesko sold information on grants for $39.95, including information about obtaining grants to go to school. This obviously appealed to Mr. DeSousa, who was beginning to understand that no matter how hard he toiled, he was never

---

[1] Mr. Lesko is a multi-millionaire who appears on ridiculous television "infomercials," selling books such as "Getting Yours: The Guide To Government Money." He has made his fortune by selling information about government grants.

going to be able to advance his education because of his impoverishment. Mr. DeSousa ordered the Lesko brochure. Mr. DeSousa then thought he could become like Mr. Lesko, selling information regarding government grants. Mr. DeSousa made copies of information concerning where to get free grants, and began trying to sell the information through newspapers such as "The Thrifty Nickel." While pursuing this idea, Mr. DeSousa eventually went off course and engaged in the fraudulent offense conduct in this case.

* * *

Mr. DeSousa reports:

> I have had a hard life, yet I am no angel. I have no previous record and I pay my taxes. I have no family left, yet I believe in my heart I'm good person. We all make mistakes. What does a man gain if he inherits the world and loses his soul? All I ask is that the Court see that I am a 48 years old and I'm human, yet with no support or family. I go to church every Sunday to ask God to give me hope for a better life. I have a hard time getting a job now due to my hearing loss, yet I don't beg for pity. I'm a human being in that without God, I am lost.

## **DISCUSSION**

**I.    THE POST-BOOKER SENTENCING FRAMEWORK.**

    **A.    The Current Law of Federal Sentencing.**

The Supreme Court fundamentally altered the federal sentencing landscape in <u>United States v. Booker</u>, 543 U.S. 220 (2005), by holding that mandatory application of the Sentencing Guidelines violated a defendant's Sixth Amendment right to a jury trial. With this decision, the Court freed sentencing courts from the rigid, formalistic framework that existed under the Guidelines, replacing it with a system that provides judges the discretion to consider any relevant characteristic of the particular defendant or of the offense. As the Supreme Court recently

confirmed, courts are "no longer . . . tied to the sentencing range indicated in the Guidelines." Cunningham v. California, 127 S. Ct. 856, 867 (2007). Instead, courts are "obliged to 'take account of' that range along with the sentencing goals Congress enumerated in the [Sentencing Reform Act] at 18 U.S.C. § 3553(a).'" Id. (quoting Booker, 543 U.S. at 259, 264); see also United States v. Pickett, 475 F.3d 1347, 1351 (D.C. Cir. 2007) ("The Court's remedial opinion [in Booker] required the district court to treat the Guidelines as advisory only and as simply one factor to be considered in sentencing.").

"In the post-Booker world, the court must calculate and consider the applicable Guidelines range but is not bound by it." United States v. Dorcely, 454 F.3d 366, 375 (D.C. Cir.), cert. denied, 127 S. Ct. 691 (2006). The sentencing judge must determine the applicable Guidelines range in the same manner as before Booker, including consideration of any policy statements issued by the Sentencing Commission and departure authority. Id. at 375 n.6. Thereafter, Booker "requires" the district court to consider the Guidelines range and the other Section 3553(a) factors. Id. at 376.

"One, but only one, of the factors a sentencing court must also consider is the sentencing range under the Guidelines." Pickett, 405 F.3d at 1352. Several courts have held that the Guidelines are entitled to no greater weight than any of the other factors. See United States v. Biheiri, 356 F. Supp. 2d 589, 594 n.6 (E.D. Va. 2005) ("No individual factor is singled out as having greater weight; instead, the richness of factual diversity in cases calls on sentencing judges to consider all of the factors and to accord each factor the weight it deserves under the circumstances."); United States v. Simon, 361 F. Supp. 2d 35, 40 (E.D.N.Y. 2005) ("[T]he Guidelines are advisory and entitled to the same weight accorded to each other factor that the

7

Court is instructed to consider by § 3553(a)."); United States v. Ranum, 353 F. Supp. 2d 984, 986-987 (E.D. Wis. 2005) (giving equal weight to each factor listed in § 3553(a)).

As the D.C. Circuit recently held regarding the proper weight to be given the "advisory-only Guideline range":

> One might answer that the Guideline range should be considered presumptively reasonable. But that would be to confuse the standard this court and several others have adopted for appellate review with the standard to be applied by the sentencing court. A sentencing judge cannot simply presume that a Guidelines sentence is the correct sentence. To do so would be to take a large step in the direction of returning to the pre-Booker regime. Another approach, the correct one in our view, is to evaluate how well the applicable Guideline effectuates the purposes of sentencing enumerated in § 3553(a).

Pickett, 475 F.3d at 1353 (footnote and citations omitted; emphasis added). "'If Booker's rendering the Guidelines discretionary means anything,' it must give district court judges greater latitude in assessing potentially mitigating factors than they had under the Sentencing Guidelines." United States v. Brown, 449 F.3d 154, 160 (D.C. Cir. 2006) (quoting United States v. Gomez, 431 F.3d 818, 825 (D.C. Cir. 2005)). The D.C. Circuit has also recognized that mitigating evidence that is not relevant to the Guidelines calculation may well be relevant to the district court's analysis of the Section 3553(a) factors. See United States v. Ayers, 428 F.3d 312, 315 (D.C. Cir. 2005).[2] It is through the consideration of all of these relevant sentencing factors that courts ensure they reach a "just punishment" as required by 18 U.S.C. § 3553(a).

---

[2] At the time the Guidelines were mandatory, courts were discouraged from considering factors such as the defendant's age, education and vocational skills, mental and emotional conditions, physical condition, and ties to family and the community, and charitable acts and good works. See U.S.S.G. § 5H1.1-4, 6, 11. These factors were "not ordinarily relevant" in determining an appropriate sentence and could only be considered in extraordinary situations. Post-Booker, however, these are precisely the types of considerations courts must now evaluate when imposing sentences.

After equal consideration of all of the Section 3553(a) factors, the court has the authority (i) "to impose the sentence that would have been imposed under the Guidelines, i.e., a sentence within the applicable Guidelines range or within permissible departure authority, or (ii) to impose a non-Guidelines sentence." United States. v. Crosby, 397 F.3d 103, 113 (2d Cir. 2005).

## II. UNDER ALL OF THE RELEVANT SENTENCING FACTORS, MR. DESOUSA SHOULD RECEIVE A SENTENCE OF NOT MORE THAN 24 MONTHS.

### A. Under the Guidelines, Mr. DeSousa's Sentencing Range is 37-46 Months.

The government and the defense agree that Mr. DeSousa's Guidelines range is 37-46 months. This calculation reflects only two points for acceptance of responsibility, per the September 2007 agreement between the parties.

The probation office, however, has included an additional two-point adjustment under U.S.S.G. § 2B1.1(b)(9)(C)(i) for "using any means of identification unlawfully to obtain any other means of identification." This appears to be based on comment 8 of the 2003 Guidelines, which cites an example of the enhancement applying where "[a] defendant obtains an individual's name and social security number from a source (e.g., from a piece of mail taken from the individual's mailbox) and obtains a bank loan in that individual's name." Comment 8(C)(ii)(1). The PSR states that since Mr. DeSousa used names and social security information that had been supplied by Donald Shirk, Gale Murphy and Carol Scoggins, as part of their employment applications, to open merchant accounts, his sentence should be enhanced under this provision.

This enhancement does not apply under the facts and circumstances of this case. Mr. DeSousa did not use the information to obtain a bank loan in the name of one of these third

9

parties.  Instead, he used the information to obtain merchant accounts.  This is an important difference because an unpaid bank loan could ultimately come back to injure Mr. Shirk, et al., whereas a merchant account would not create any liabilities in their names.  The other example cited by the Guidelines–"using an individual's name and address from a source (e.g., from a driver's license in a stolen wallet) [to obtain] a credit card in that individual's name," Comment 8(C)(ii)(ll)–illustrates the same principle.  In both cases, there is a form of identity theft that would ultimately injure the party from whom the personal information was stolen.  That is not the case here.  Accordingly, the two point enhancement at U.S.S.G. § 2B1.1(b)(9)(C)(i) should not apply in this case.

      **B.**      **The Nature and Circumstances of the Offense.**

            **1.**      **The ATMs.**

The government makes much of the situation with respect to Mr. DeSousa's ATM business.  There are two important points with respect to this issue.  First, it bears noting that this case is simply not about Mr. DeSousa's ATM-related business.  If the government seeks to charge Mr. DeSousa with ATM-related crimes (or with contempt), it is of course free to take its case to the grand jury.  But that is not this case.  Mr. DeSousa has had no discovery rights or other procedural protections with respect to the ATM allegations, and it is unfair to use this case as a pretext for punishing Mr. DeSousa because of the ATM issues.

Second, the ATM issues were brought before the Court in September 2007 because of a potential issue regarding Mr. DeSousa's conditions of release, i.e., the Court's order for Mr. DeSousa to shut down his ATM businesses.  Pursuant to an agreement between the defense and the government, Mr. DeSousa agreed not to contest his immediate incarceration at D.C. Jail, and

also to lose his third point for acceptance of responsibility. On the government's side, the government agreed not to pursue any further sentencing enhancements based on this issue. Thus, these issues were resolved, and the defense respectfully submits that the Court should proceed to sentencing based upon the facts of <u>this</u> case, and not peripheral issues which were supposed to have been already settled through an agreement by the parties.

        **2.**        **The Offense Conduct In This Case.**

The real offense conduct in this case is making small unauthorized charges to numerous credit cards, a fraudulent "massage service" which had a handful of victims, and to the nonpayment of several vendors. For these schemes, Mr. DeSousa accepts responsibility and is deserving of punishment. As a first offense, however, the punishment should not exceed several years. As with other first time offenders who come before the Court, Mr. DeSousa is deserving of a second chance.[3] Furthermore, a shorter sentence will also allow Mr. DeSousa to make restitution in a more timely manner.

        **C.**        **The History and Characteristics of Mr. DeSousa.**

As discussed above, Mr. DeSousa is a 48-year old man who has had a very hard life. <u>See</u> discussion, <u>supra</u>. He knows none of the comforts that most Americans take for granted. In terms of his physical condition, he has basically no hearing in one ear, and suffers from a generally broken-down condition that has resulted from decades of living on the streets, in homeless shelters, and at group homes. At all times relevant to this case (and up to the time of his incarceration), Mr. DeSousa was living in an extremely modest apartment and using the bus

---

[3]     <u>See</u> <u>The Washington Post</u>, "Hiring Process Was Bypassed For Prosecutor," May 8, 2007 (United States Attorney Jeffrey Taylor quoted as saying: "Sure he's made some mistakes in judgment. For gosh sakes, everyone deserves a second chance").

for transportation.[4]  He is also an obvious cigarette addict, which may be a contributing factor to his advanced periodontal disease.  As a result of that condition, Mr. DeSousa is missing numerous teeth.

>   D.  **After Considering All Appropriate Sentencing Factors, Including The Guidelines Range, the Court Should Sentence Mr. DeSousa to Not More Than 24 Months.**

Mr. DeSousa is 48 years old with no previous criminal convictions, or even arrests.  Two years in prison will make quite clear to him (and to the public) that the offense conduct in this case will not be tolerated.  Two years imprisonment plus a period of supervised release is more than enough punishment to ensure that Mr. DeSousa will, in the future, commit his obvious resourcefulness and work ethic towards lawful pursuits, and that he will not repeat the mistakes of this case.  In short, two years is the period of time that is "sufficient, but not greater than necessary," to meet the goals of punishment in this case.

---

[4]  The government refers to Mr. DeSousa's extremely humble abode, which was photographed at the time the search warrant was executed in this case, as a "fraud shack."  Gov. Mem. at 7.  The defense certainly agrees with the second part of the government's statement.

\* \* \*

**WHEREFORE**, the aforementioned background information concerning Joaquim DeSousa is submitted for this Court's consideration and to encourage the Court to sentence Mr. DeSousa to no more than 24 months incarceration.

                                       Respectfully submitted,
                                       A.J. Kramer
                                       Federal Public Defender


                                       _____/s/_____
                                       Jonathan S. Jeffress
                                       Assistant Federal Public Defender
                                       625 Indiana Avenue, N.W.
                                       Washington, D.C.  20004
                                       (202) 208-7500, ex.134